JiDUFRESNE, Judge.
This is an appeal in an automobile accident ease by Sandra Jimerson and Paula Batiste, plaintiffs-appellants, from a judgment dismissing their claims for damages against Stephanie Parrino and her insurer, State Farm Automobile Insurance Company, defendants-appellees. Because we find no legal or manifest factual error in the decision of the trial judge, we affirm.
Because of our disposition of the matter, we need not repeat the facts in detail. We do, however, set forth the following basic facts to explain our resolution of this appeal. There is no real dispute that Parrino’s car struck the plaintiffs’ taxi in the rear in stop- and-go traffic on the interstate highway. What is in dispute is whether the plaintiffs were injured in this incident. Based primarily on the trial judge’s determination that neither plaintiffs testimony was credible, he ruled that they had not met their burden of proving that they were indeed injured. Plaintiffs contend here that this was error.
Because plaintiffs urge that the trial judge fell into factual error, our standard of review is limited to the question of whether the facts found by Rthe trier of fact are manifestly erroneous, or clearly wrong, Rosell v. ESCO, 549 So.2d 840 (La.1989). In conducting this inquiry, we are required to review the entire record, and if that review shows that the trial court findings are reasonable we may not reverse those findings, even though we might have weighed the evidence differently had we been sitting as the trier of fact, id. Further, when findings are based on determinations of the credibility of witnesses, the manifest error rule demands great deference to the trier of fact’s *377 findings because he has seen the witnesses first hand, id. Finally, when there are two permissible views of the evidence, the factfin-der’s choice between them cannot be manifestly wrong, id.
In the present case, the evidence regarding the nature of the accident and the plaintiffs’ alleged injuries was as follows. As noted above, the parties were in rush-hour stop-and-go traffic at about 5 P.M. on July 6, 1990. Jimerson and Batiste were in the front seat of a Lincoln taxicab usually driven by Jimerson, and Parrino was driving a Cadillac. The Lincoln came to a stop and the Cadillac bumped its rear bumper. Parrino got out of her car to see if any damage had been done to either car, but found none. She went up to the driver’s window of the Lincoln and apologized, and asked if anyone needed any assistance, but was told no. She also asked if they could all go about their business, but Jimerson said that because her taxi was involved she had to wait for the insurance investigator to come out and make a report.
Joe Messina, the investigator for the taxi’s insurer, duly appeared and took photographs which he contended showed slight damage to the right rear bumper of the cab and “almost center with the bumper and grill toward the left side” of the Cadillac. The original photographs had been lost because the insurance company had gone into receivership, but Messina Igproduced a xerox copy of them. On cross examination he admitted that he was unable to see any damage in the copy, but insisted that he had seen it at the scene. He was then shown enlarged color photographs of the respective front and rear bumpers which were taken by the defense shortly after the accident and before any repairs had been made, but was again unable to point out exactly where the damage was or to see it in those enlargements. He nonetheless reiterated that he had seen some damage on both vehicles. He further testified that he asked the plaintiffs if either of them had been injured and both told him that they had not been.
Both plaintiffs testified that later in the evening they began to experience increasing discomfort in their necks and backs. They consulted an attorney who recommended that they see Dr. Charles S. Simmons. This practitioner testified that over 90% of his practice is generated by attorney referrals. He first saw Jimerson on July 12,1990, some six days after the accident. X-rays were normal, but palpation revealed that the neck and back muscles were tensed up. His initial diagnosis was a strain of the cervical lumbar spine and right trapezius muscle, and a sprain to one knee. He noted that upon admission his nurse took, a medical history from the patient, which he then reviewed with the patient before conducting an examination. In both instances Jimerson denied ever having been in any accidents or having previous injuries. He saw this patient twelve times over the next ten months, and she continued to complain of the same basic symptoms. At this point he recommended that she consult an orthopaedist. She also returned for one visit in October of 1992 complaining of numbness in her legs, and was again advised to see a specialist.
In regard to Batiste, her treatment is remarkably similar to that of Jimerson. Again, X-rays were normal, but palpation revealed tenseness injjthe neck and back muscles. The original diagnosis was cervical lumbar strain. The medical history taken by his nurse, and verified with the patient by him, shows that Batiste also denied ever having been in any accidents or being injured. He treated this patient nine times during the next ten months, and because of her continuing complaints he referred her to a specialist.
The doctor was of the opinion that both patients’ complaints were genuine and that their injuries were the result of the accident. He admitted on cross-examination, however, that the muscle tenseness that he felt in both patients was not of an involuntary nature and could indeed have been caused by simply tensing up their muscles. He also admitted that he knew of various examination procedures in use by specialists to detect malingering, but did not know these techniques and therefore did not use them. He also said that neither patient had informed him that they were in a second accident together on September 1, 1990, some month and a half after he first began treating them. He fur *378 ther testified that had the patients been in accidents prior to July 6, 1990, and not revealed those accidents to him when asked on their first visit, then he would have concluded that more probably than not they were malingering.
The defense in this case inquired of both plaintiffs whether they had been involved in prior accidents or lawsuits. Both admitted to at least one prior accident, but could not recollect others. It turned out that both had been involved in at least two other previous accidents from which litigation arose. The defense also called Dr. Charles Hatsell, an expert in biomechanics and injury causation analysis. This expert was both a medical doctor and an engineer, and had done extensive research for the U.S. Air Force on the effects of various forces on the human body. He explained that in the normal environment gravity exerts a certain force on all bodies at rest, Igwhich is referred to scientifically as the “g” force. He testified that the body experiences various multiples of this “g” force when subjected to different motions, and he produced a chart showing the number of “g” forces present in daily life. For example, sitting down on a hard bench was shown to generate 6.2 “g”s of force on the spine. Similarly, sitting down in a car seat generates 1.5 “g”s and jumping off a 7½ inch step produces 8.2 “g”s.
In regard to the accident at issue, he first noted that the bumper of the Cadillac was designed to withstand an impact of 2½ mph before any damage to the lights or turn indicators will occur. Because he could find no such damage, he assumed the speed at impact was less than the design impact speed. However, he gave the plaintiffs the benefit of the doubt and assumed an impact speed of 4 mph. Calculating from this speed and from the weights of the two cars, he concluded that the force which would have been generated on the two passengers in the taxi was between two-thirds and one “g” force. It was his expert opinion that this slight force would not have caused any physical injury to the people in the taxi. He further stated that the force of the impact would not have been great enough to move the heavier Lincoln, but would have done no more than to rock it on its suspension system.
We have carefully examined the entire record of this case, and conclude that the decision of the trier of fact against the plaintiffs is clearly based on a permissible view of the evidence. We particularly point out that plaintiffs case depended for the most part on only their subjective veracity. Immediately after the accident they apparently told both the defendant and the insurance investigator that neither of them were in need of medical treatment. Both claimed to have developed worsening symptoms over the next few days and first went to the doctor six days after the incident. |6Neither informed the doctor of prior accidents or injuries, and during treatment neither bothered to inform the doctor of a subsequent accident. The doctor admitted that both could have been feigning their symptoms of tense muscles, and that the X-rays of both were normal. He further stated that if the patients had indeed had prior injuries that they did not reveal to him when asked, then he would think that more probably than not they were malingering.
The trier of fact specifically found that plaintiffs were not credible. Once that testimony was rejected, there was little, if any, other evidence to substantiate their claims of injuries. When to this is added the somewhat nebulous testimony of the insurance investigator, who was unable to identify any damage to the cars in either his own or the defense’s photographs, as well as the defense expert’s testimony about the magnitude of the collision, there is certainly a permissible view of the evidence to support the conclusion that plaintiffs failed to carry their burden of proving that they were injured in the accident.
For the foregoing reasons, we hereby affirm the judgment of the district court in favor of the defendants.

AFFIRMED.